# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GORDON DALE MEADOR, | 1:14-cv-00006-DAD-EPG (PC) |
| Plaintiff, | FINDINGS AND RECOMMENDATIONS, RECOMMENDING THAT DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT BE GRANTED IN PART AND DENIED IN PART |
| v. | |
| K. AYE, et al., | (ECF Nos. 99 & 127) |
| Defendants. | OBJECTIONS, IF ANY, DUE WITHIN TWENTY ONE DAYS |
| | ORDER DENYING DEFENDANTS' MOTION TO STRIKE PLAINTIFF'S RESPONSE TO REPLY TO DEFENDANTS' REPLY TO MOTION FOR SUMMARY JUDGMENT |
| | (ECF NO. 114) |

## I.      BACKGROUND

Gordon Meador ("Plaintiff") is a state prisoner proceeding *pro se* and *in forma pauperis* with this civil rights action pursuant to 42 U.S.C. § 1983.  This action now proceeds on the First Amended Complaint, filed on September 22, 2015, against defendants Garza, Sellers,[1] Aye, Moon, Nguyen, Clark, Kim, and Gill (collectively, "Defendants") on Plaintiff's claims for

---

[1] Defendants refer to "Sellers" as "Selliers."  As "Sellers" is currently the name on the Court's docket sheet, the Court will refer to this defendant as "Sellers."

deliberate indifference to his serious medical needs in violation of the Eighth Amendment. (ECF Nos. 30, 36, 37, & 38).[2]

On November 29, 2016, Defendants filed a motion for summary judgment. (ECF No. 99).[3] On January 6, 2017, Plaintiff filed his opposition to the motion for summary judgment ECF No. 108),[4] a declaration in support of the opposition to the motion for summary judgment (ECF No. 108-1, p. 177 & ECF No. 108-2 pgs. 1-11), and his statement of disputed facts (ECF No 109). Plaintiff also incorporated his First Amended Complaint into his opposition by reference. (ECF No. 108, p. 15). On January 13, 2017, Defendants filed a reply. (ECF No. 111). On January 27, 2017, Plaintiff filed what the Court construes as a surreply. (ECF No. 113). On January 30, 2017, Defendants filed a motion to strike Plaintiff's surreply. (ECF No. 114). On February 23, 2017, Plaintiff objected to Defendants' motion to strike. (ECF No. 115).

Given some confusion regarding whether Plaintiff abandoned parts of a claim, on March 30, 2017, the Court allowed Defendants to file a supplemental motion for summary judgment. (ECF No. 121). On April 17, 2017, Plaintiff filed a "belated notice of medical records are authenticated by defense counsel as her own evidence in the summary judgment motion." (ECF No. 125). On April 18, 2017, Defendants filed their supplemental motion for summary judgment. (ECF No. 127). On April 27, 2017, Plaintiff filed his opposition to the supplemental motion for summary judgment. (ECF No. 131). On May 1, 2017, Defendants filed their reply. (ECF No. 133). Because it appeared that Plaintiff may have filed his opposition to the supplemental summary judgment motion before actually receiving a copy of it, the Court allowed Plaintiff to file another opposition. (ECF No. 134). On May 11, 2017,

---

[2] Defendant Smith was dismissed from the case on June 30, 2016, via a stipulation (ECF Nos. 77 & 81).
[3] Concurrently with their motion for summary judgment, Defendants served Plaintiff with the requisite notice of the requirements for opposing the motion. Woods v. Carey, 684 F.3d 934, 939-41 (9th Cir. 2012); Rand v. Rowland, 154 F.3d 952, 960-61 (9th Cir. 1998).
[4] Because Plaintiff's opposition to the motion for summary judgment is signed under penalty of perjury (ECF No. 108, p. 31), the Court will treat this opposition not only as an opposition to the motion for summary judgment, but also as a declaration in support of the opposition.

Plaintiff filed his second opposition to the supplemental motion for summary judgment.[5] On May 19, 2017, Defendants filed their reply. (ECF No. 138).

Defendants' motion for summary judgment, supplemental motion for summary judgment, and motion to strike are now before the Court. For the reasons that follow, the Court will recommend that Defendants' motions for summary judgment be granted in part and denied in part. Additionally, the Court will deny Defendants' motion to strike.

## II.    DEFENDANTS' MOTION TO STRIKE

Defendants ask the Court to strike Plaintiff's surreply because it is an impermissible attempt by Plaintiff to file additional facts in opposition to the motion for summary judgment. (ECF No. 114). Plaintiff filed a response, stating that he is not an attorney, has no access to a law library, is not well versed in law, and has a GPL of 2.9.[6] (ECF No. 115). Plaintiff further asserts that allowing Plaintiff to file his surreply will not prejudice Defendants. (Id.).

Given Plaintiff's lack of legal sophistication, as well as the lack of prejudice to Defendants in allowing Plaintiff to file a surreply, the Court will treat the surreply as including a request to file a surreply, and grant it *nunc pro tunc*. Accordingly, Defendants' Motion to strike will be denied.

However, the Court notes that the surreply does not change the Court's analysis. Most of the surreply involves Plaintiff summarizing evidence he previously submitted and reiterating facts he has already alleged. (ECF No. 113, pgs. 1-3).

In the surreply, Plaintiff also alleges that he was not able to prepare his opposition to the motion for summary judgment satisfactorily because there is no law library where Plaintiff is housed. (Id. at p. 1). However, Plaintiff himself has admitted that there is a law library where he is housed; he just does not believe it is adequate. (ECF No. 110, pgs. 1-2). Plaintiff also stated that he received a law book from a fellow inmate, which he utilized in preparing his

---

[5] Because Plaintiff's second opposition to the supplemental motion for summary judgment is signed under penalty of perjury (ECF No. 136, p. 10), the Court will treat this opposition not only as an opposition to the supplemental motion for summary judgment, but also as a declaration in support of the opposition.

[6] Plaintiff does not explain what GPL stands for. It is the Court's understanding that GPL stands for Grade Point Level.

3

opposition to the motion for summary judgment. (Id. at p. 2). Given this, as well as the instructions Plaintiff received on how to oppose a motion for summary judgment (ECF No. 99, pgs. 1-3; ECF No. 127-1, pgs. 1-3), the additional time the Court already gave Plaintiff to file his opposition (ECF No. 103), the fact that Plaintiff was able to file an opposition to the motion for summary judgment, a statement of disputed facts, a surreply, and two oppositions to the supplemental motion for summary judgment (ECF Nos. 108, 109, 113, 131, & 136), and the fact that it does not appear that additional research from Plaintiff would be helpful, the Court finds that Plaintiff was able to adequately prepare his oppositions and surreply and is not prejudiced by the Court ruling on Defendants' motions for summary judgment without giving Plaintiff additional time to research and prepare an additional opposition to the motions for summary judgment.

### III. PLAINTIFF'S ALLEGATIONS IN THE COMPLAINT

Plaintiff was housed at California State Prison, Corcoran ("CSPC") when the events giving rise to this action took place. Plaintiff alleges the following.

Plaintiff suffers from chronic lower back pain as a result of normal wear and tear and a motorcycle accident prior to imprisonment. The pain did not affect his ability to walk, work, or engage in recreational activities.

Plaintiff suffered from chronic problems related to heart disease and diabetes. He received frequent adenosine and insulin injections, blood tests, and other intravenous (IV) administration for his problems. At various times, he also suffered from Hepatitis A, B, and C, which also required frequent injections, IVs, and/or blood tests for treatment.

In or around the beginning of May of 2012, Plaintiff was diagnosed with spondylolysis and/or spondylolisthesis at the L5-S1 vertebrae of his spine.

In or around the spring of 2012, Plaintiff was transferred from California State Prison–Sacramento to CSPC. Between April 2012 and February 2014, Defendants provided medical treatment to Plaintiff. Defendants knew or should have known of Plaintiff's medical conditions and personal history.

CSPC's medical facility and instruments were unsanitary and staff did not take the precautions necessary to sterilize the environment and all medical tools. Staff administered a series of injections and IV treatments to Plaintiff using the unsanitary equipment. As a result of receiving injections, IVs, and/or blood tests for his various medical ailments in the unsanitary conditions at CSP, Plaintiff developed a severe infection of the spine referred to as discitis/osteomyelitis.

By in or around May or June of 2012, Plaintiff presented symptoms of discitis/osteomyelitis in his spine, including severe and debilitating pain that impeded him from walking. For more than eight months, Plaintiff was not provided the examinations, monitoring, and testing required to identify and treat the disease. The infection was finally identified and treated by medical professionals outside of CSPC when they fortuitously identified the disease while treating him for an unrelated heart-related problem.

Beginning in or around April of 2012, Plaintiff made a series of complaints about this new back pain that affected his ability to walk and bend or lift his left leg. He also reported suffering from chills. In response, he was given a walker by medical staff at CSPC .

In or around May of 2012, the back pain became unbearable and Plaintiff filed an emergency medical appeal. He was examined by medical staff and was told the pain was caused by a torn oblique muscle. He was not provided special housing for his pain and inability to walk.

Plaintiff continued to complain of abnormal back pain and an inability to move, sit, and walk. He was bed ridden and authorized to eat and stay in his cell. He frequently cried and hyperventilated in response to the pain that he rated a 10 out of 10. He advised medical staff that these were new complaints.

Medical staff determined that the degree of pain claimed by Plaintiff exceeded their findings and found that he was not a surgical candidate, but instead was acting "irrational." Staff informed Plaintiff that he had a crushed disc in his back, and that the pain was muscular in origin. They recommended he exercise more frequently and gave him a pamphlet regarding

back pain. They also prescribed additional pain, anti-inflammatory, and muscle relaxant medications.

In or around July or August of 2012, Plaintiff could no longer move or stand without assistance. He reported severe back pain that radiated into his chest and affected his abilities to move his left leg and walk. He fell down while alone in his cell on several occasions, severely injuring his back against the toilet on one occasion. He fell because he was confined to a cell without the assistance required to move in light of his spinal infection, including the walker that had been ordered for him in April of 2012.

Thereafter, medical staff reviewed an X-ray of Plaintiff's spine, which did not reveal any new problems in Plaintiff's back. The imaging was not sufficiently sensitive to detect discitis/osteomyelitis. He was discharged without treatment for the infection.

Between June 2012 and February 2013, Plaintiff submitted more than 30 complaints and/or requests for medical treatment concerning his back pain. He requested an MRI and surgical intervention on several occasions. Many of his complaints were not recorded by staff. Additionally, staff did not accurately and fully record facts affecting his medical care, nor did staff report all of the details concerning his medical problems, including that on several occasions Plaintiff was found in his cell unable to move after defecating and/or urinating on himself. In response, staff did not order or perform MRI and/or CT scans.

Plaintiff's physical health deteriorated over time due to the spinal infection. He stopped showering, changing his clothes, and even "bird-bathing," due to the pain. He lost control of his bodily functions and suffered frequent involuntary bowel movements and/or urination. Other times, he could not void himself completely. He often relied on non-medical staff and cell mates to eat, dress, go to the bathroom and generally care for himself.

Plaintiff's mental health also deteriorated. He became increasingly depressed, hypervigilant, and paranoid. He felt completely helpless and lost all hope of receiving the necessary treatment.

In or around October of 2012, nursing staff failed to fully and accurately report Plaintiff's complaints and facts surrounding his deteriorating condition, and/or intervene to

provide the medical care needed to treat his back. Plaintiff resorted to pleading with a mental health technician about his medical care. The technician reported his complaints to medical staff, but medical staff failed to examine, monitor, or test Plaintiff for discitis/osteomyelitis.

In or around December of 2012, Plaintiff was again denied medical treatment when prison nurses failed to fully and accurately report his complaints. Plaintiff again resorted to pleading with nonmedical staff including correctional officers Miranda and Pardo. Medical staff refused to examine, monitor, or test Plaintiff for discitis/osteomyelitis.

In or around February of 2013, Plaintiff was taken to San Joaquin Community Hospital ("SJCH") for symptoms related to a purported heart attack. Examination by doctors at SJCH revealed significant disc narrowing. An MRI confirmed the presence of discitis/osteomyelitis at the T12-L1 vertebrae. A biopsy revealed scattered soft tissue and bone fragments infiltrated by neutrophils consistent with acute discitis/osteomyelitis. Doctors at SJCH concluded that the infection caused Plaintiff's pain and rendered him paralyzed. SJCH doctors informed Plaintiff that the infection was equivalent to having a broken back. Plaintiff was advised that the infection had spread and eaten away at the vertebrae due to lack of prior treatment by medical staff at CSPC. The doctors concluded that surgery was too dangerous, and therefore Plaintiff was placed on an aggressive medication regimen involving the administration of some of the strongest antibiotic prescription drugs available, Vancomycin and Daptomycin.

Between approximately February and April of 2013, Plaintiff was treated for the infection in his spine with antibiotics. A peripherally inserted central catheter ("PICC Line") was subsequently implemented to administer the medication. In or around April or May of 2013, staff at CSPC discontinued Plaintiff's antibiotics. They noted an MRI was needed to determine if there was any residual discitis/osteomyelitis, but they did not perform or direct others to perform an MRI or CT scan. The severe pain in Plaintiff's back returned and he was unable to walk again.

In or around May to June of 2013, Plaintiff made a number of complaints of severe back pain that prevented him from moving or walking. He was not examined by medical staff

for more than three weeks. When he was finally examined, the pain was so severe that Plaintiff had to be taken back to SJCH.

At SJCH, Plaintiff reported cramps and spontaneous vomiting to medical staff. He said the pain in his back went through his chest. An MRI revealed total obliteration of the disc space at the T12-L1 vertebra, which had decreased Plaintiff's body height, and diffuse marrow edema, which confirmed residual discitis/osteomyelitis.

SJCH medical staff again recommended that Plaintiff undergo antibiotic treatment rather than surgical intervention due to risks of paralysis. Plaintiff was advised that his clinical course for improvement would take longer due to the lack of prior treatment of the infection and surgical intervention. They hoped that a qualified physician could provide corrective lumbar instrumentation after the infection was cured. They recommended use of a custom medical corset, which the California Department of Corrections and Rehabilitation ("CDCR") refused to provide because Plaintiff could not afford to pay the $1,400.00 cost of the brace.

Plaintiff resumed heavy antibiotic treatment in or around July 2013. He continued to experience significant pain and was unable to walk, stand, or lay down for extended periods of time. He worried constantly that the infection would spread, that the potent antibiotics would have lasting consequences, and that paralysis would occur at any moment. Mental health staff noted that he was even more anxious, depressed, agitated, and distressed than in 2012. In diagnosing Plaintiff, they identified his Axis III problems as spinal infection.

In November of 2013, Plaintiff could still not fully ambulate or walk for any significant distance. He was taken to SJCH where an MRI revealed that the infection was subsiding. However, the imaging revealed fusing of the T12-L1 vertebral bodies, canal narrowing, and permanent injuries to Plaintiff's spine. Additionally, medical staff identified a new area of abnormality on the superior end plate of the T11 vertebrae of Plaintiff's spine, which was confirmed to be a lesion. They believed that it was imperative for an expert in neurosurgery or spinal orthopedic surgery to evaluate Plaintiff for surgical intervention, but the only local surgeon could not perform the surgery. Plaintiff was discharged and returned to CSPC without any such evaluation.

Plaintiff's injuries have substantially diminished his quality of life. He can no longer exercise, play handball, or engage in yoga. He frequently falls due to an inability to support his own body weight. He cannot walk without support for more than a handful of steps and will never regain the ability to do so. His mental health has increasingly deteriorated. He can no longer work in prison industries or fix electronic devices, which generated income of approximately $600 per month. He has spent approximately $300 for a wheelchair, $46 for a cane, and $53 for a brace. He must spend approximately $5 per month for medication. He cannot afford the $1,400 necessary to obtain the custom corset prescribed by doctors.

The infection in Plaintiff's spine led to the development of a lesion on his T11 end plate vertebrae. The lesion could lead to paralysis. The lesion was caused by the spinal infection that went untreated and unidentified by Defendants.

## IV.    SCREENING ORDER

The Court[7] found a cognizable claim for deliberate indifference to serious medical needs against Garza and Sellers because Plaintiff stated "he was in severe pain and made repeated statements to Garza and Sellars[8] of his condition, but Garza and Sellars ignored, failed to respond, and/or failed to accurately record his complaints and requests for care. Plaintiff claims this was despite the fact that Plaintiff was no longer able to walk or care for himself, and was involuntarily defecating and urinating on himself." (ECF No. 36, p. 9).

The Court also found a cognizable claim for deliberate indifference to serious medical needs against defendants Aye, Moon, Nguyen, Clark, Kim, Smith, and Gill, because, "[a]lthough Plaintiff concedes Defendants provided medical care, his allegations demonstrate that they persistently ignored his complaints of severe pain and the deterioration of his physical condition. Further, Plaintiff alleges that Defendants' medical care and the failure to provide appropriate tests were medically unacceptable under the circumstances, and this course of action was chosen in conscious disregard of an excessive risk to his health." (Id. at 10).

---

[7] Magistrate Judge Dennis L. Beck was the assigned magistrate judge until September 8, 2016. (ECF No. 92).

[8] The First Amended Complaint refers to "Sellers" as "Sellars." As "Sellers" is currently the name on the Court's docket sheet, the Court will refer to this defendant as "Sellers."

The Court found no other cognizable claims.  (Id. at 11).

The Court gave Plaintiff the choice of filing an amended complaint or notifying the Court that he was willing to proceed only on the cognizable claims.  (Id.).  Plaintiff elected to proceed only on the claims found cognizable by the Court.  (ECF No. 37).

## V.    LEGAL STANDARDS

### a.  Summary Judgment

Summary judgment in favor of a party is appropriate when there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); Albino v. Baca ("Albino II"), 747 F.3d 1162, 1169 (9th Cir. 2014) (en banc) ("If there is a genuine dispute about material facts, summary judgment will not be granted.").  A party asserting that a fact cannot be disputed must support the assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials, or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1).

A party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986), quoting Fed. R. Civ. P. 56(c).  If the moving party moves for summary judgment on the basis that a material fact lacks any proof, the court must determine "whether a fair-minded jury could reasonably find for the [non-moving party]."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986) ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.").  "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  Celotex, 477 U.S. at 322.  "[C]onclusory allegations unsupported by factual

data" are not enough to rebut a summary judgment motion. <u>Taylor v. List</u>, 880 F.2d 1040, 1045 (9th Cir. 1989), citing <u>Angel v. Seattle-First Nat'l Bank</u>, 653 F.2d 1293, 1299 (9th Cir. 1981).

In reviewing a summary judgment motion, the Court may consider other materials in the record not cited to by the parties, but is not required to do so. Fed. R. Civ. P. 56(c)(3); <u>Carmen v. San Francisco Unified School Dist.</u>, 237 F.3d 1026, 1031 (9th Cir. 2001). In judging the evidence at the summary judgment stage, the Court "must draw all reasonable inferences in the light most favorable to the nonmoving party." <u>Comite de Jornaleros de Redondo Beach v. City of Redondo Beach</u>, 657 F.3d 936, 942 (9th Cir. 2011). It need only draw inferences, however, where there is "evidence in the record . . . from which a reasonable inference . . . may be drawn"; the court need not entertain inferences that are unsupported by fact. <u>Celotex</u>, 477 U.S. at 330 n. 2.

Additionally, the Court must liberally construe Plaintiff's filings because he is a *pro se* prisoner. <u>Thomas v. Ponder</u>, 611 F.3d 1144, 1150 (9th Cir. 2010).

**b. Deliberate Indifference to Serious Medical Needs**

"[T]o maintain an Eighth Amendment claim based on prison medical treatment, an inmate must show 'deliberate indifference to serious medical needs.'" <u>Jett v. Penner</u>, 439 F.3d 1091, 1096 (9th Cir. 2006), (quoting <u>Estelle v. Gamble</u>, 429 U.S. 97, 104 (1976)). This requires a plaintiff to show (1) "a 'serious medical need' by demonstrating that 'failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain,'" and (2) that "the defendant's response to the need was deliberately indifferent." <u>Id.</u> (quoting <u>McGuckin v. Smith</u>, 974 F.2d 1050, 1059-60 (9th Cir. 1992) (citation and internal quotations marks omitted), <u>overruled on other grounds by</u> <u>WMX Technologies v. Miller</u>, 104 F.3d 1133 (9th Cir. 1997) (*en banc*)).

Deliberate indifference is established only where the defendant *subjectively* "knows of and disregards an *excessive risk* to inmate health and safety." <u>Toguchi v. Chung</u>, 391 F.3d 1051, 1057 (9th Cir. 2004) (emphasis added) (citation and internal quotation marks omitted).

Deliberate indifference can be established "by showing (a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference." Jett, 439 F.3d at 1096 (citation omitted). Civil recklessness (failure "to act in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known") is insufficient to establish an Eighth Amendment violation. Farmer v. Brennan, 511 U.S. 825, 836-37 & n. 5 (1994) (citations omitted). To prevail, a plaintiff "must show that the course of treatment the doctors chose was medically unacceptable under the circumstances... and... that they chose this course in conscious disregard of an excessive risk to plaintiff's health." Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996) (internal citations omitted).

Where a prisoner is alleging a delay in receiving medical treatment, the delay must have led to further harm in order for the prisoner to make a claim of deliberate indifference to serious medical needs. McGuckin at 1060 (citing Shapely v. Nevada Bd. of State Prison Comm'rs, 766 F.2d 404, 407 (9th Cir. 1985)).

A difference of opinion between an inmate and prison medical personnel—or between medical professionals—regarding appropriate medical diagnosis and treatment is not enough to establish a deliberate indifference claim. Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir. 1989); Toguchi, 391 F.3d at 1058. Additionally, "a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." Estelle, 429 U.S. at 106.

## VI. DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

In their motion for summary judgment, Defendants allege that Plaintiff's claims are not supported by evidence or medical science. (ECF No. 99-1, p. 2; ECF No. 127, p. 9). Defendants also provide evidence that they were not deliberately indifferent to Plaintiff's serious medical needs, and in fact provided medical care to Plaintiff. (ECF No. 99-2; ECF No. 127-2).

Defendants also argue that Plaintiff admitted that his claim for deliberate indifference ended when he was hospitalized in February of 2013, and thus abandoned his claim for deliberate indifference after that date. (ECF No. 99-1, p. 13; ECF No. 127, p. 8).

The Court notes that, in his opposition to the motion for summary judgment, instead of directing the Court's attention to evidence supporting his claims, Plaintiff simply attaches approximately 500 pages of exhibits. Not one of Plaintiff's three oppositions directs the Court's attention to evidence supporting Plaintiff's claim. Plaintiff has left it to the Court and Defendants to sift through Plaintiff's evidence to determine what evidence Plaintiff has presented regarding how each defendant violated his constitutional rights. This is not appropriate. The Court is "not required to comb the record to find some reason to deny a motion for summary judgment." Forsberg v. Pac. Nw. Bell Tel. Co., 840 F.2d 1409, 1418 (9th Cir. 1988); Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1029 (9th Cir. 2001). Instead, the "party opposing summary judgment must direct [the Court's] attention to specific, triable facts." Southern California Gas Co. v. City of Santa Ana, 336 F.3d 885, 889 (9th Cir. 2003).

Additionally, Plaintiff failed to properly address Defendants' statements of undisputed fact. Accordingly, the Court may consider Defendants' assertions of fact as undisputed for purposes of this motion. Fed. R. Civ. P. 56(e)(2); Local Rule 260(b).

The Court also notes that, in his opposition to the motion for summary judgment, which was filed on January 6, 2017, Plaintiff stated that he is trying to obtain declarations from several witnesses. (ECF No. 108, p. 27). These declarations have not been submitted to the Court. Given that the discovery period has closed, that the Court already gave Plaintiff approximately sixty additional days to respond to the motion for summary judgment (ECF No. 103), and that Plaintiff never filed a motion requesting the reopening of discovery, the Court will not give Plaintiff additional time to obtain evidence.

### a. Evidentiary Objections

Defendants have made objections to Plaintiff's evidence, which the Court has carefully

reviewed. To the extent that the Court necessarily relied on evidence that has been objected to, the Court relied only on evidence it considered to be admissible. It is not the practice of this Court to rule on evidentiary matters individually in the context of summary judgment, unless otherwise noted. This is particularly true when "many of the objections are boilerplate recitations of evidentiary principles or blanket objections without analysis applied to specific items of evidence." Capital Records, LLC v. BlueBeat, Inc., 765 F.Supp.2d 1198, 1200 n.1 (C.D.Cal. 2010) (quoting Doe v. Starbucks, Inc., No. SACV 08–0582 AG (CWx), 2009 WL 5183773, at *1 (C.D.Cal. Dec. 18, 2009)).

### b. Defendants' Argument that Plaintiff Admitted that Defendants were No Longer Deliberately Indifferent to his Serious Medical Needs After his Hospitalization in February of 2013

The Court finds that Plaintiff did not admit that his claims for deliberate indifference ended after his hospitalization in February of 2013. However, based on the evidence presented by the parties, the Court finds that it is undisputed as a matter of fact that Plaintiff's claims for deliberate indifference against Defendants ended after he was hospitalized in February of 2013.

Defendants argue that Plaintiff admitted that, once he was hospitalized in February of 2013, Defendants were no longer deliberately indifferent to Plaintiff's serious medical needs. (ECF No. 99-1, p. 13; ECF No. 127, pgs. 2-3). Defendants rely on what Plaintiff said in his deposition. In the deposition, Defendants' counsel asked Plaintiff, "What are the dates you're claiming these doctors were deliberately indifferent to you." (ECF No. 99-2, p. 58). Plaintiff replied, "At the prison." (Id.). Defendants' counsel then asked, "But what are the dates? Are you claiming that when you came back from the hospital they were still deliberately indifferent?" (Id.). Plaintiff replied, "No. No. This happened way before that." (Id.). Defendants' counsel then asked, "So is it accurate that their deliberate indifference would have stopped once you were sent out to the hospital?" (Id.). Plaintiff replied, "Yes, ma'am." (Id.).

While, based on the deposition, Plaintiff does appear to be saying that any deliberate indifference to Plaintiff's serious medical needs stopped after he was sent to the hospital in

February of 2013, Plaintiff alleges that he was actually referring to when his second infection was finally cleared up. (ECF No. 108, p. 11).

Given the fact that the First Amended Complaint clearly alleges deliberate indifference after February of 2013, the ambiguity of the question Plaintiff was asked at his deposition (Plaintiff was treated at a hospital for his spinal infection on at least two occasions), and Plaintiff's explanation that he was referring to when his second infection was finally cleared up, the Court finds that Plaintiff did not admit that his claim for deliberate indifference ended after his hospitalization in February of 2013. While Plaintiff's statement could be used against him at trial, this Court declines to treat it as a formal waiver of claims.

However, in one of his oppositions to the supplemental motion for summary judgment, Plaintiff states that "[w]hen plaintiff was re-infected in his spine, none of the previous defendants named pre[-]February 2013 caused Plaintiff problems except Dr. Smith, who prematurely discharged plaintiff without ordering another MRI to make sure plaintiff was free of the spinal infection." (ECF No. 131, p. 4). Plaintiff alleges that "[t]his lapse clearly caused the re-occurrence of the infection." (Id.). "There was [sic] several other people responsible for refusing to treat plaintiff the second time, but not the pre-February defendants." (Id. at 4-5). While these statements were not made under penalty of perjury, they match Defendants' version of events (See Supplemental Motion for Summary Judgment Separate Statement of Undisputed Facts 13-18).[9]

As Dr. Smith was dismissed from this case on June 30, 2016, via a stipulation (ECF Nos. 77 & 81), the Court finds that it is undisputed that Plaintiff's claim for deliberate indifference against the remaining defendants ended after Plaintiff was hospitalized in February of 2013. The Court basis this finding on the statements made by Plaintiff that are described above, as well as Federal Rule of Civil Procedure 56(e)(2) and Local Rule 260(b).

---

[9] The Court notes that Plaintiff also states that Defendants "were responsible for the cause of infection to the spine and refusing treatment from 2012 through the end of the infection in around June or July 2013" and that "[t]he now named defendants were clearly responsible for the infection, the denial of medical treatment, and infliction of pain and suffering both physical and mental, up until June or July 2013." (ECF No. 131, p. 5). However, Plaintiff provided no evidence to support these statements (which were not made under penalty of perjury). Additionally, these statements directly contradict the statements Plaintiff made that are described above.

### c. Plaintiff's Claim that Defendants' Deliberate Indifference to Plaintiff's Serious Medical Needs Caused Plaintiff's Spinal Infection

Plaintiff alleges that he received a series of injections and had IV's placed in his arms in unsanitary facilities where there were food crumbs, wrappers, and pests. (ECF No. 30, pgs. 12-13; ECF No. 108, pgs. 23 & 25-26; ECF No. 108-2, pgs. 2-3, ¶¶ 6, 7, 8). Plaintiff further alleges that defendant Garza directed defendant Sellers (and other staff) to perform procedures on Plaintiff (including injections) without taking the proper measures for sanitation, and that the above-described unsanitary conditions caused his spinal infection. (ECF No. 30, p. 15; ECF No. 108, pgs. 25-26; ECF No. 108-2, pgs. 2-3, ¶¶ 6, 7, 8).

Defendants submitted evidence, in the form of a declaration from Dr. Barnett,[10] that "there is no medical or scientific evidence to support" Plaintiff's allegation that Plaintiff's spinal infection was caused by the alleged use of dirty insulin needles, and that "[i]t is virtually unheard of for patients to be seriously infected by the injections, IV placement or blood drawings done by medical professionals." (ECF No. 99-2, p. 65, ¶ 9).

It is not clear that this claim survived screening. (See ECF No. 36, pgs. 9-10). However, if it did, the Court finds that summary judgment should be granted to Defendants on this claim.

Under Rule 702 of the Federal Rules Evidence, "only relevant and reliable expert opinion testimony is admissible." U.S. v. Sandoval-Mendoza, 472 F.3d 645, 654 (9th Cir. 2006). Testimony "is reliable if the knowledge underlying it 'has a reliable basis in the knowledge and experience of [the relevant] discipline.'" Id., quoting Kumho Tire Co. v. Carmichael, 526 U.S. 137, 149 (1999). "A trial court should admit medical expert testimony if physicians would accept it as useful and reliable." Id.

Lay opinion may be offered by laymen under Rule 701 so long as the opinion is based on the witness's own perception, is helpful to understanding the witness's testimony or to

---

[10] Dr. Barnett is employed by California Correctional Health Care Services as Chief Medical Consultant for the Receiver's Office of Legal Affairs. (ECF No. 99-2, p. 62, ¶ 1). Dr. Barnett attended Harvard Medical School, and is currently licensed to practice medicine in the State of California (Id. at pgs. 62-63, ¶ 2).

determining a fact in issue, and is not based on the kinds of specialized knowledge within the scope of Rule 702. Fed. R. Evid. 701.

Plaintiff has not provided any admissible evidence that his spinal infection was caused by Defendants. Plaintiff's sworn statements do not defeat the motion for summary judgment on this claim because Plaintiff is not an expert who is qualified to testify as to the cause of his spinal infection. The cause of Plaintiff's spinal infection is not something that is rationally based on Plaintiff's perceptions, and testimony regarding the cause would need to be based on scientific evidence. Therefore, Plaintiff may not testify as to the cause of the infection. Plaintiff has submitted no other evidence regarding the cause the infection. Moreover, there is no medical record or diagnosis from a treating doctor supporting Plaintiff's conclusion. Conversely, Defendants have submitted evidence that it is highly unlikely that receiving an injection in unsanitary conditions caused the infection. (ECF No. 99-2, p. 65, ¶¶ 8 & 9).

Because Plaintiff has failed to submit any evidence that Defendants caused the infection, and because Defendants have provided evidence that they did not, the Court finds that a fair-minded jury could not reasonably find that Defendants' deliberate indifference caused Plaintiff's infection. Accordingly, Defendants should be granted summary judgment on this claim.[11]

> **d. Plaintiff's claim that Defendants Garza and Sellers Were Deliberately Indifferent to Plaintiff's Serious Medical Needs by Ignoring, Failing to Respond, and/or Failing to Accurately Record Plaintiff's Complaints and Requests for Care**

In its screening order, the Court found that Plaintiff stated a cognizable claim for deliberate indifference to serious medical needs against defendants Garza and Sellers because Plaintiff stated "he was in severe pain and made repeated statements to Garza and Sellars of his condition, but Garza and Sellars ignored, failed to respond, and/or failed to accurately record

---

[11] There appears to be a dispute of fact regarding whether Plaintiff's prior IV drug use caused the infection. (ECF No. 108, pgs. 15-16; ECF No. 108-2, p. 2, ¶ 4); (ECF No. 99-2, p. 75, ¶ 42)). Given that Plaintiff has failed to provide any evidence that Defendants were responsible for Plaintiff's infection, the Court need not delve into this issue.

his complaints and requests for care. Plaintiff claims this was despite the fact that Plaintiff was no longer able to walk or care for himself, and was involuntarily defecating and urinating on himself." (ECF No. 36, p. 9).

### A. Defendant Sellers

The Court finds that there is a genuine dispute of material fact regarding whether defendant Sellers was deliberately indifferent to Plaintiff's serious medical needs.

Defendants have provided evidence, in the form of defendant Sellers' testimony, that defendant Sellers did not prevent Plaintiff from obtaining medical care that defendant Sellers believed that Plaintiff needed. (ECF No. 99-2, p. 42, ¶ 4). Some of Plaintiff's evidence corroborates this statement. (See, e.g., ECF No. 108-2, p. 3, ¶ 8).

However, Plaintiff has submitted a substantial amount of evidence that defendant Sellers was in fact deliberately indifferent to Plaintiff's serious medical needs.

Plaintiff submitted evidence that on several occasions defendant Sellers refused to give Plaintiff his pain and heart medication because Plaintiff was unable to stand or walk to get it. (ECF No. 108, p. 22). She would only give Plaintiff food and medication if he crawled to the door. (Id. at 20).

Plaintiff has submitted evidence that on several occasions defendant Sellers came to his cell to laugh at his inability to walk, and the fact that he defecated on himself. (ECF No. 108-2, pgs. 2-3 & 9-10, ¶¶ 8, 18).

Plaintiff has submitted evidence that in May of 2012, his back pain became "unbearable." (ECF No. 108, p. 6). He was not provided with special housing, and his pain became so unbearable he had to defecate on himself. (Id.). "Defendant Selliers refused repeatedly to contact medical and accused [Plaintiff] of malingering. She at one time in front of Plaintiff told Defendant Aye that 'Meador' was faking. She also continued to refuse to make any medical reports on Plaintiff'[s] condition. He [sic] continued behavior went on for several months." (Id.). She also "refused repeated requests for emergency treatment." (ECF No. 108-2, p. 9, ¶ 18).

Plaintiff has submitted evidence that Sellers filled out "Refusal for Treatment" forms, even though Plaintiff did not actually refuse treatment (he was unable to move, stand, or walk). (ECF No. 108-2, p. 5, ¶ 11).

Based on the evidence provided by Plaintiff, the Court finds that there is a genuine dispute of material fact regarding whether defendant Sellers was deliberately indifferent to Plaintiff's serious medical needs. Accordingly, the Court will recommend that Defendants' summary judgment motion be denied as to Plaintiff's deliberate indifference claim against defendant Sellers.

### B. Defendant Garza

Defendants allege that "Plaintiff admits he does not know who Defendant Garza is or how she was involved in his care." (ECF No. 99-1, p. 14).

While it is not as clear as Defendants portray, the Court finds that defendant Garza should be granted summary judgment on this claim.

"The general rule in the Ninth Circuit is that a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony. This sham affidavit rule prevents a party who has been examined at length on deposition from rais[ing] an issue of fact simply by submitting an affidavit contradicting his own prior testimony, which would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact…. But the sham affidavit rule should be applied with caution because it is in tension with the principle that the court is not to make credibility determinations when granting or denying summary judgment. In order to trigger the sham affidavit rule, the district court must make a factual determination that the contradiction is a sham, and the inconsistency between a party's deposition testimony and subsequent affidavit must be clear and unambiguous to justify striking the affidavit." Yeager v. Bowlin, 693 F.3d 1076, 1080 (9th Cir. 2012) (internal citations and quotations omitted) (alteration in original).

A declaration may be considered "to be a sham when it contains facts that the affiant previously testified he could not remember." (Id.). However, "newly-remembered facts, or new facts, accompanied by a reasonable explanation, should not ordinarily lead to the striking

of a declaration as a sham…. [T]he non-moving party is not precluded from elaborating upon, explaining or clarifying prior testimony elicited by opposing counsel on deposition and minor inconsistencies that result from an honest discrepancy, a mistake, or newly discovered evidence afford no basis for excluding an opposition affidavit." (Id. at 1081).

During Plaintiff's deposition, in response to the question, "What does Nurse Garza look like," Plaintiff replied "I don't know." Defendants' counsel then asked, "Have you ever seen Nurse Garza?" Plaintiff replied, "I don't know. I'm never – I probably seen her, but I can't recall. I tried to remember when I seen her name in the reports, but I can't. My attorney that did the complaint, he's the one that put it in there and said her name -- or his name was on the paperwork. That's all I know about it." (ECF No. 99-2, p. 52). In response to the question "And you don't know why Nurse Garza is part of this lawsuit?", Plaintiff replied, "I just know my attorney named that individual in the complaint. And I think I found some of the records, and I sent those to you to show you what everybody did in there…." (Id. at 55-56).

Additionally, defendant Garza submitted a declaration, stating that she does not recall Plaintiff, and that she is not aware of any medical records that show any interaction or treatment that she provided to Plaintiff. (ECF No. 99-2, p. 39, ¶ 2).

Plaintiff never directly disputed the properly supported assertion that he does not know who defendant Garza is or how she was involved in his care. Moreover, even though Defendants argue that, based on Plaintiff's deposition testimony, Plaintiff does not know who defendant Garza is or how she was involved in his care, Plaintiff never explained or clarified his deposition testimony.

Plaintiff does allege that his medical records prove his contentions against defendant Garza. (ECF No. 108-2, p. 10, ¶ 20). However, Plaintiff does not cite to any specific medical record. Conversely, Defendants have provided evidence that defendant Garza did not in fact provide medical care to Plaintiff. According to the sworn declaration of Dr. Barnett, Dr. Barnett reviewed Plaintiff's medical records regarding care provided to Plaintiff from 1987 to the present day, and "[t]he medical records do no [sic] reflect medical care provided by defendant[] Garza…." (ECF No. 99-2, p. 64, ¶ 5).

While not dispositive to the Court's ruling, the Court notes that Plaintiff's allegations regarding the actions of defendant Garza are sparse. This supports Plaintiff's deposition testimony, specifically that Plaintiff cannot recall ever seeing defendant Garza and that he does not know how she was involved in his care.

Accordingly, the Court finds that there is a clear and unambiguous inconsistency between Plaintiff's deposition testimony and his subsequent declaration and verified pleadings, and that the contradiction is a sham. Plaintiff was given the opportunity to explain these inconsistencies, but did not. Additionally, Plaintiff has failed to point to medical records supporting his claim against defendant Garza. Therefore, the Court will disregard the portions of Plaintiff's declaration and verified pleadings that refer to defendant Garza.[12]

As Plaintiff has submitted no other evidence regarding the conduct of defendant Garza, the Court will recommend that defendant Garza be granted summary judgment on this claim.

### e. Plaintiff's Claim that Defendants Aye, Moon, Nguyen, Clark, Kim, and Gill Were Deliberately Indifferent to Plaintiff's Serious Medical Needs

In its screening order, the Court found that Plaintiff stated a cognizable claim for deliberate indifference to serious medical needs against defendants Aye, Moon, Nguyen, Clark, Kim, and Gill, because, "[a]lthough Plaintiff concedes Defendants provided medical care, his allegations demonstrate that they persistently ignored his complaints of severe pain and the deterioration of his physical condition. Further, Plaintiff alleges that Defendants' medical care and the failure to provide appropriate tests were medically unacceptable under the circumstances, and this course of action was chosen in conscious disregard of an excessive risk to his health." (ECF No. 36, p. 10).

However, Plaintiff's evidence does not support a claim of deliberate indifference against defendant Aye, Moon, Nguyen, Clark, Kim, or Gill. Accordingly, the Court will

---

[12] Alternatively, because Plaintiff never directly disputed Defendants' properly supported assertion that Plaintiff does not know who defendant Garza is or how she was involved in his care, the Court finds this fact undisputed. Fed. R. Civ. P. 56(e)(2); Local Rule 260(b).

recommend that defendants Aye, Moon, Nguyen, Clark, Kim, and Gill be granted summary judgment on this claim.

## A.    Factual Allegations

It appears to be undisputed that Plaintiff's lower back pain began in 1993. Motion for Summary Judgment Separate Statement of Undisputed Fact ("MSJ SSUF") 9. In 2004, Plaintiff's MRI showed left neural foraminal stenosis at L5-S1. MSJ SSUF 11. Lumbar x-rays taken in 2008 showed mild grade I spondylolisthesis at L5-S1. MSJ SSUF 12. Spondylolisthesis is the term used to describe the anatomic abnormality where one vertebral body abnormally placed or "slipped" in relation to the one below. MSJ SSUF 13. This condition is commonly found at the L5-S1 level and progression of this condition with impairment is rare. MSJ SSUF 14.

Plaintiff alleges that he began showing symptoms of osteomyelitis/discitis in May or June of 2012, "including severe and debilitating pain that impeded him from standing and walking." (ECF No. 108, p. 5). Plaintiff alleges that for more than eight months he was not provided the examinations, monitoring, and testing required to identify and treat the disease. (Id.). It was not until he was sent to an outside hospital that the disease was identified and treated. (Id.).

It is undisputed that on February 23, 2013, Plaintiff was taken to San Joaquin Community Hospital ("SJCH"), and while there was diagnosed with osteomyelitis/discitis (although there seems to be a dispute about why Plaintiff was sent to SJCH). (ECF No. 99-2, p. 75; ECF No. 108, p. 10). It is undisputed that Plaintiff was placed on medication to deal with the spinal infection. (ECF No. 99-2, p. 75; ECF No. 108, p. 11). It is undisputed that between February and April of 2013, Plaintiff was treated for the spinal infection with antibiotics. (ECF No. 108, p. 11; MSJ SSUF 106; Supplemental Motion for Summary Judgment Separate Statement of Undisputed Facts 13-14).

It is undisputed that in April of 2013, Plaintiff's antibiotics were discontinued by Dr. Smith (ECF No. 108, p. 11; ECF No. 131 p. 4; ECF No. 99-2, p. 57; Supplemental Motion for Summary Judgment Separate Statement of Undisputed Facts 13-14). Plaintiff alleges that Dr.

Smith noted an MRI was needed to determine if there was any residual osteomyelitis/discitis, but did not perform or direct others to perform an MRI or CT Scan. (ECF No. 108, p. 11; ECF No. 131 p. 4).

Plaintiff alleges that the severe pain returned, and in or around May or June of 2013 Plaintiff made a number of complaints of severe back pain that prevented him from moving or walking. (ECF No. 108, p. 11). He was not examined by medical staff for more than three weeks. (Id.). The pain was so severe that Plaintiff had to be taken back to SJCH. (Id. at p. 12). An MRI revealed total obliteration of the disk space at the T12-L1 vertebra, which had decreased Plaintiff's height, and diffuse marrow edema, which confirmed residual osteomyelitis/discitis. (Id.). Plaintiff was again advised to take antibiotics. (Id.). He further advised that due to prior lack of treatment, it would take longer for his condition to improve. (Id.).

As he did in his complaint, Plaintiff alleges that his spinal infection was not diagnosed and treated properly by defendant Aye, Moon, Nguyen, Clark, Kim, or Gill, and that these defendants ignored his complaints. To support his claim, he provides evidence in the form of his testimony, as well as medical records.

### B.    Summary of Legal Standard

"Deliberate indifference is a high legal standard." Toguchi, 391 F.3d at 1060. Deliberate indifference is a very high standard. Civil recklessness (failure "to act in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known") is insufficient to establish an Eighth Amendment violation. Farmer, 511 U.S. at 836-37 & n. 5 (1994) (citations omitted). To prevail, Plaintiff "must show that the course of treatment the doctors chose was medically unacceptable under the circumstances… and… that they chose this course in conscious disregard of an excessive risk to plaintiff's health." Jackson, 90 F.3d at 332 (internal citations omitted).

### C.    Analysis

While the timing of the deterioration of Plaintiff's condition is disputed, it appears undisputed that Plaintiff had serious medical needs. Additionally, Plaintiff has submitted

evidence that his serious medical needs were not diagnosed and treated appropriately.  (See, e.g., ECF No. 108 pgs. 6-8; ECF No 136, p. 5).  Taking Plaintiff's evidence as true, there is a genuine dispute of material fact as to whether defendants Aye, Moon, Nguyen, Clark, Kim, and Gill failed to properly identify the cause of Plaintiff's back pain, and failed to provide the treatment that Plaintiff needed.

However, based on the evidence submitted, the Court finds that there is no genuine dispute of fact as to whether defendant Aye, Moon, Nguyen, Clark, Kim, or Gill consciously disregarded an excessive risk to Plaintiff's health (before or after February of 2013).  To prevail, Plaintiff needed to put forth evidence showing not only that his serious medical needs were not treated properly, but also that in choosing their course of action, defendant Aye, Moon, Nguyen, Clark, Kim, or Gill acted with a conscious disregard of an excessive risk to Plaintiff's health.

Taking Plaintiff's evidence as true, Plaintiff may have shown that that defendants Aye, Moon, Nguyen, Clark, Kim, and Gill were negligent.  He may even have shown that they failed to act in the face of an unjustifiably high risk of harm that is so obvious that it should have been known.  However, Plaintiff has provided no evidence that shows (or allows the Court to draw a reasonable inference) that defendant Aye, Moon, Nguyen, Clark, Kim, or Gill consciously disregarded an excessive risk to Plaintiff's health.

It is undisputed that Plaintiff was receiving medical care for his back pain.  (ECF No. 108, pgs. 29-30; MSJ SSUF 17-19, 25-27, 29-37, 53-55, 62-65, 68-71, 80-85, 88-95, 97-98, & 101-102).  Based on Plaintiff's evidence, it appears that Plaintiff's condition was not treated appropriately because defendants Aye, Moon, Nguyen, Clark, Kim, and Gill did not believe that Plaintiff's condition was as serious as it was, not because they consciously disregarded an excessive risk to Plaintiff's health.  There is no evidence that defendant Aye, Moon, Nguyen, Clark, Kim, or Gill subjectively knew of the seriousness of Plaintiff's condition.

For example, Plaintiff submitted evidence that "[D]efendants" determined that the degree of pain claimed by Plaintiff exceeded their findings, and told Plaintiff that he had a crushed disk in his back, and that the pain was muscular in origin.  (ECF No. 108, p. 7).  To

treat this condition, Dr. Moon gave Plaintiff a pamphlet on back exercise and prescribed additional pain, anti-inflammatory, and muscle relaxant medications. (Id.). On another occasion, "Defendants" reviewed an old x-ray, which was not sufficiently sensitive to detect the osteomyelitis/discitis.[13] (Id. at 8). Accordingly, Plaintiff was not provided treatment for his infection. (Id.). Plaintiff has alleged that, on another occasion, when he was in the hospital and could not walk, both Dr. Kim and Dr. Moon stated in their reports that Plaintiff was faking. (Id. at p. 17). They sent Plaintiff back to the yard without treating Plaintiff's infection. (Id.). Plaintiff has also submitted evidence that Dr. Gill examined Plaintiff several times, that Plaintiff could not stand or walk when he was examined by Dr. Gill, and that Dr. Gill told Plaintiff that Plaintiff was exaggerating his symptoms. (Id. at 24).

None of these examples, or any of the evidence provided by Plaintiff, shows (or allows the Court to draw a reasonable inference) that any of the defendants consciously disregarded Plaintiff's serious medical needs. Instead, it appears that they simply did not believe Plaintiff's medical needs were as serious as they were. While "a factfinder may conclude that [defendants] knew of a substantial risk from the very fact that it was obvious," Farmer, 511 U.S. at 826, Plaintiff's condition was not obvious. Neither back pain nor a spinal infection is something that defendant Aye, Moon, Nguyen, Clark, Kim, or Gill could simply observe. Additionally, it is undisputed that, "[b]ecause the onset of symptoms from diskitis and osteomyelitis can be insidious, it is not unusual for diagnosis to be delayed for some weeks or months after initial presentation of symptoms." SSUF 127.

Moreover, even assuming that Plaintiff's condition was as serious as he alleges (and during the time periods he alleges it was serious), it may not even be defendant Aye, Moon, Nguyen, Clark, Kim, or Gill's fault that they did not believe Plaintiff's medical needs were as serious as they were. Plaintiff himself has submitted evidence that defendants Aye, Moon, Nguyen, Clark, Kim, and Gill were not always informed about Plaintiff's need for health care, or the seriousness of his condition. For example, Plaintiff submitted evidence that "Defendant

_____

[13] The Court notes that Plaintiff is not qualified to testify regarding the sensitivity of an x-ray, and the Court is not treating this as evidence.

Selliers refused repeatedly to contact medical and accused [Plaintiff] of malingering. She at one time in front of Plaintiff told Defendant Aye that 'Meador' was faking. She also continued to refuse to make any medical reports on Plaintiff'[s] condition. He [sic] continued behavior went on for several months." (ECF No. 108, p. 6). As another example, Plaintiff submitted evidence that, while he repeatedly requested an MRI and surgery, "[m]any of the complaints were not recorded by medical staff. Additionally, staff did not accurately and fully record facts affecting [Plaintiff's] medical care. Nor did staff report all of the details concerning his medical problems, including that on several occasions [sic] he was found in his cell unable to move." (Id. at 8-9).

Plaintiff does submit evidence that defendant Aye refused to do an MRI, stating that an MRI costs too much, and that the state is broke. (ECF No. 108, p. 16). If defendant Aye believed that an MRI was medically necessary, but refused to provide it, that would be evidence of deliberate indifference. However, there is no evidence that defendant Aye believed that Plaintiff needed an MRI.

Plaintiff also submitted evidence that, contrary to Defendants' assertions, he never refused medical treatment. (Id. at 17). If defendant Aye, Moon, Nguyen, Clark, Kim, or Gill lied about Plaintiff refusing medical care, that would be some evidence of deliberate indifference. However, Plaintiff directly contradicted this statement in his declaration. According to Plaintiff, he did not go to several medical appointments, because he could not stand or walk. (ECF No. 108-2, p. 5, ¶ 11). While, according to Plaintiff, it was defendant Sellers who filled out "Refusal for Treatment" forms, Plaintiff has not submitted evidence that defendant Aye, Moon, Nguyen, Clark, Kim, or Gill knew that defendant Sellers filled out Refusal for Treatment forms even though Plaintiff did not refuse treatment.

Plaintiff also submitted evidence that he saw defendant Nguyen on May 8, 2012, and that defendant Nguyen "refused to do anything." (ECF No. 108, pgs. 24-25). If defendant Nguyen flat our refused to provide care to Plaintiff, that would be evidence of deliberate indifference. However, once again, Plaintiff contradicts himself. Right after Plaintiff accuses defendant Nguyen of doing nothing, Plaintiff states that he was sent to Bakersfield Memorial

Hospital. (Id. at 25). And, based on Defendants undisputed assertions of fact, it was defendant Nguyen who arranged for Plaintiff to be sent to Bakersfield Memorial Hospital. (MSJ SSUF 17-20). Accordingly, it is undisputed that defendant Nguyen did not "refuse[] to do anything."

Finally, Plaintiff alleges that defendant Kim informed medical staff to ignore Plaintiff's complaints, and that medical records show that defendant Kim knew of Plaintiff's possible infection, but that defendant Kim did nothing. (ECF No. 108-2, p. 8, ¶ 17). If true, these allegations would be evidence of deliberate indifference. However, Plaintiff never alleged, let alone submitted evidence, that any of his complaints were actually ignored because of what defendant Kim said. In fact, according to Plaintiff, his complaints were ignored before defendant Kim got involved. As to Plaintiff's allegation that the medical records show that defendant Kim knew of Plaintiff's possible infection, Plaintiff did not cite to any medical record to back up his assertion.

Accordingly, because the Court finds that a fair-minded jury could not reasonably find that defendant Aye, Moon, Nguyen, Clark, Kim, or Gill consciously disregarded an excessive risk to plaintiff's health, the Court will recommend that defendants Aye, Moon, Nguyen, Clark, Kim, and Gill be granted summary judgment on this claim.[14]

## VII.    CONCLUSION AND RECOMMENDATIONS

Because Plaintiff failed to submit any evidence that Defendants caused his spinal infection, Defendants should be granted summary judgment on Plaintiff's claim that

---

[14] The Court notes that Plaintiff alleges that he was not given the appropriate medical devices to assist with mobility, and because of this he fell down on several occasions. (ECF No. 108, p. 7). He also alleges that "defendants" failed to provide appropriate assistance to Plaintiff in his cell to prevent falling. (Id. at 29).

Plaintiff also alleges that the "CDCR" refused to provide Plaintiff with a custom medical corset, which staff at SJCH recommended. (Id. at 12). While the CDCR is not a defendant in this case, in his second opposition to the supplemental motion for summary judgment Plaintiff alleges that it was "defendants" who refused to provide the corset. (ECF No. 136, p. 4).

It does not appear that a claim for deliberate indifference to serious medical needs based on these allegations survived screening. (See ECF No. 36, pgs. 9-10). Even if it did, Plaintiff himself states that "Defendants" ordered that Plaintiff have a walker. (ECF No. 108, p. 7). For some reason it was never provided (id.), but Plaintiff submitted no evidence as to why it was not provided or that any of the defendants in this case were responsible for failing to provide it. Plaintiff also failed to provide any evidence to show that the walker was not a sufficient medical device to assist with mobility.

As to Plaintiff's claim that he was not provided with a custom medical corset, Plaintiff has failed to provide any evidence that a defendant in this case was responsible for this deprivation.

Defendants' deliberate indifference caused Plaintiff's infection. Because Plaintiff admitted that he does not know who defendant Garza is or how she was involved in Plaintiff's treatment, and because this fact is undisputed, defendant Garza should be granted summary judgment on the claim that she was deliberately indifferent to Plaintiff's serious medical needs. Finally, because Plaintiff failed to submit any evidence that defendant Aye, Moon, Nguyen, Clark, Kim, or Gill consciously disregarded an excessive risk to Plaintiff's health, summary judgment should be granted to these defendants on Plaintiff's claim that they were deliberately indifferent to Plaintiff's serious medical needs.

However, the Court finds that there is a genuine dispute of material fact regarding whether defendant Sellers was deliberately indifferent to Plaintiff's serious medical needs. Therefore, summary judgment should be denied as to defendant Sellers.

Accordingly, IT IS HEREBY RECOMMENDED that:

1. Defendants' motions for summary judgment (ECF Nos. 99 & 127), be GRANTED in part and DENIED in part;

2. To the extent that a claim for deliberate indifference to Plaintiff's serious medical needs based on Defendants' failure to provide the appropriate assistance to Plaintiff in his cell to prevent falling survived screening, that Defendants be granted summary judgment on this claim;

3. To the extent that a claim for deliberate indifference to Plaintiff's serious medical needs based on Defendants' failure to provide Plaintiff with a custom medical corset survived screening, that Defendants be granted summary judgment on this claim

4. Defendants be granted summary judgment on Plaintiff's claim that Defendants' deliberate indifference caused Plaintiff's spinal infection;

5. Defendants Aye, Moon, Nguyen, Clark, Kim, Gill, and Garza be granted summary judgment on the claim that they were deliberately indifferent to Plaintiff's serious medical needs; and

6. Defendant Sellers be denied summary judgment on Plaintiff's claim that defendant Sellers was deliberately indifferent to Plaintiff's serious medical needs.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l).  Within twenty-one (21) days after being served with these findings and recommendations, any party may file written objections with the court.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within seven (7) days after service of the objections.  The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal.  Wilkerson v. Wheeler, 772 F.3d 834, 838-39 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

Additionally, IT IS ORDERED that Plaintiff's request to file a surreply is GRANTED *nunc pro tunc*, and Defendants' Motion to strike is DENIED.

IT IS SO ORDERED.

Dated:  **August 29, 2017**              /s/ Erica P. Grosjean

UNITED STATES MAGISTRATE JUDGE